IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

LISA SHOOK, as            )
Administratrix of the     )
Estate of Zackary Shook,  )
Deceased,                 )
                          )
        Plaintiff,        )
                          )        CIVIL ACTION NO.
        v.                )        2:18cv1048-MHT
                          )           (WO)
JEFFERSON DUNN, et al.,   )
                          )
        Defendants.       )

OPINION

This lawsuit arises out of the death of inmate
Zackary Shook from an overdose of drugs allegedly
supplied to him by an Alabama Department of Corrections
(ADOC) correctional officer. The plaintiff is the
administrator of Shook's estate; she is also his mother.
The defendants include, among others, the following three
ADOC officials: Commissioner Jefferson Dunn, Associate
Commissioner of Health Services Ruth Naglich, and Kilby

Warden Phyllis J. Billups.[1]  The administrator asserts
two claims: a federal claim of violation of Shook's
Eighth Amendment right (as enforced through 42 U.S.C.
§ 1983) and an Alabama state claim for wrongful death.
The court has subject-matter jurisdiction pursuant to
28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367
(supplemental).

The three ADOC officials have filed a motion to
dismiss.  The motion will be granted.

## I. MOTION-TO-DISMISS STANDARD

In considering a motion to dismiss, the court accepts
the plaintiff's allegations as true, *see Hishon v. King
& Spalding*, 467 U.S. 69, 73 (1984), and construes the
complaint in the plaintiff's favor, *Duke v. Cleland*, 5
F.3d 1399, 1402 (11th Cir. 1993).  "The issue is not
whether a plaintiff will ultimately prevail but whether

---

1. The defendants also include former ADOC
correctional officer Antwan Giles; ADOC's healthcare
provider Corizon, LLC; two unknown ADOC officers; and two
unknown Corizon employees.

the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

## II. FACTS

The allegations in the plaintiff administrator's complaint, which the court accepts as true for the purposes of resolving this motion, are as follows.

In November 2016, Shook was an inmate at Kilby Correctional Facility where he participated in a rehabilitation program to treat his drug addiction. Antwan Giles, a Kilby correctional officer, "was participating in a scheme to smuggle contraband and drugs--including methamphetamine, suboxone, oxycodone, hydrocodone, Xanax, marijuana, and a synthetic drug known as 'spice'--into Kilby Correctional Facility to sell and/or distribute to inmates in his custody." Second Am. Compl. (doc. no. 36) at 4. Commissioner Dunn, Associate Commissioner Naglich, and Warden Billups were aware that many people at Kilby were addicted to methamphetamine.

3

In the very early morning of December 16, 2016, Shook ingested methamphetamine he received from correctional officer Giles. He collapsed, convulsing and unable to breathe, in his cell. Another prisoner witnessed his collapse and alerted, apparently by pressing a call button, other ADOC correctional officers to the medical emergency. It took the ADOC officers and employees of ADOC's healthcare provider, Corizon, LLC, approximately 15 minutes to arrive, and, when they did, they saw that Shook was turning blue from lack of oxygen and struggling to breathe or speak. None of them made any effort to provide medical care or treatment or to resuscitate him. A subsequent autopsy revealed that Shook died from a myocardial infarction caused by ingestion of the methamphetamine he obtained from Giles.

One month after Shook's death, correctional officer Giles was arrested for possession of controlled substances, trafficking in illegal drugs, promoting prison contraband, and possession of marijuana. In

October 2018, he was convicted of these offenses and sentenced to six years in federal prison.

At the time of Shook's overdose in 2016, Kilby had an occupancy rate of 317.7 %. That same year, Kilby's correctional officer staffing level was 53.7 %, that is, only 53.7 % of positions were filled. And, that same year, 11 prisoners died at Kilby--a rate twice as high as any other ADOC facility--and four died in the month of December 2016 alone. Two years before, in April 2014, auditors had found that Kilby's security was critically threatened by a shortage of officers, unauthorized activities, possession of illegal cell phones, and illegal drugs in the institution. In 2016, the "Medical Advisory Committee for Kilby" reported that officers were not swiftly bringing prisoners in for necessary medical treatment. Second Am. Compl. (doc. no. 36) at 6-7.

## III. DISCUSSION

As stated, the plaintiff administrator asserts two claims against the three ADOC officials: a federal claim of violation of Shook's Eighth Amendment right under 42 U.S.C. § 1983 and an Alabama state claim for wrongful death.

### A. Federal Claim

The three ADOC officials have been sued in both their official and individual capacities. Because only money damages are sought, the Eleventh Amendment bars any federal claim against them in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity."). The court readily concludes that the three officials are due to be dismissed to the extent they have been sued under federal law in their official capacities.

While the three ADOC officials are also due to be dismissed in their individual capacities, the analysis is more complicated. They argue they are immune in their individual capacities under the qualified-immunity doctrine. This doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To raise the defense of qualified immunity, defendants must first show that they were acting within the scope of their discretionary authority at the time of the allegedly unconstitutional act. *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). It is clear here that the three ADOC officials were acting within the scope of their discretionary authority.

The court therefore turns to the second part of the required qualified-immunity analysis: whether the

plaintiff administrator here has met her burden to show that the three ADOC officials are not entitled to qualified immunity. To do this, she must show (1) an actual violation of her son's constitutional right and (2) the right at issue was clearly established at the time it was violated. *See Pearson,* 555 U.S. at 232.

The administrator's claim that the three ADOC officials violated Shook's Eighth Amendment right, as enforced through § 1983, is based on two main theories. First, she asserts Shook's right was violated when a correctional officer provided him with drugs. Second, she asserts his right was violated when other correctional officers failed to provide adequate medical care when he experienced a medical emergency from overdosing on the drugs. With regard to the ADOC officials' liability under both theories, certain broad principles are applicable.

On either theory, the administrator must establish a causal link between the ADOC officials and the alleged

violation. "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or *respondeat superior*." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). Here, it is not alleged that the ADOC officials were personally involved in the incident. However, the administrator may still establish liability by showing either that a "history of widespread abuse" put the officials "on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so," or that the officials' "improper custom or policy result[ed] in deliberate indifference to constitutional rights." *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)) (internal quotation marks omitted).

As to the second prong of the qualified-immunity analysis, the administrator may demonstrate that a right is clearly established in one of three ways: "(1) case

law with indistinguishable facts clearly establishing the
constitutional right; (2) a broad statement of principle
within the Constitution, statute, or case law that
clearly establishes a constitutional right; or (3)
conduct so egregious that a constitutional right was
clearly violated, even in the total absence of case law."
*Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288,
1291-92 (11th Cir. 2009) (internal citations omitted).

### i. Provision of Drugs by Correctional Officer

The plaintiff administrator's first theory is that
the ADOC officials should be held liable for correctional
officer Giles's providing Shook with drugs, which she
alleges violated Shook's Eighth Amendment right.  On this
theory, the court need not reach the question of whether
the administrator has shown a violation of a clearly
established right.  The administrator's theory against
the ADOC officials fails because she has not shown any

causal relationship between their actions and Giles's actions.

Here, from aught that appears from the allegations in the complaint, a rogue correctional officer gave drugs to Shook in violation of federal law and was rightfully criminally prosecuted and punished. The broad allegations set forth in the administrator's complaint, that the ADOC officials' hiring, staffing, and training policies constituted deliberate indifference to Shook's Eighth Amendment right, are too attenuated from Giles's alleged acts to satisfy the causation requirement. As pled, there is nothing to indicate that the ADOC officials should have, or even could have, anticipated and prevented such obviously unlawful conduct from one rogue officer. Because the administrator has failed to provide sufficient allegations in her complaint to show that the ADOC officials were responsible, directly or indirectly, for Giles's specific conduct--that is, the

officials should have anticipated and prevented it--her claim against them fails under this theory.

### ii. Deprivation of Medical Care

As to her second theory of liability, the administrator alleges that correctional officers failed to respond adequately to Shook's medical emergency.

It is long established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation and citation omitted). Because the right to such medical care for prisoners is clearly established, the question before the court now is whether the administrator has shown that the ADOC officials violated that right.

The administrator alleges that the three ADOC officials are liable because they "engag[ed] in ... policies, practices, and customs," Second Am. Compl.

(doc. no. 36) at 12, of failing to "hire, train, and
place sufficient numbers of officers in Kilby
Correctional Facility to properly respond to inmate
medical emergencies" and "support the healthcare needs
of prisoners," *id.*; of failing to "hire, train, and place
correctional officers in Kilby Correctional Facility with
the ability to recognize inmate medical emergencies,"
*id.*; and of failing "to train correctional officers in
Kilby Correctional Facility in proper response to an
inmate medical emergency," *id.*  The administrator claims
that the three ADOC officials had "actual or constructive
knowledge" of these "deficient policies, practices and
customs" and thus acted with "deliberate indifference"
to Shook's constitutional right to medical care.  *Id.* at
12-13.

Therefore, the administrator's attribution to the
three ADOC officials of the correctional officers'
failure to respond adequately to Shook's medical
emergency is based on essentially two categories of

13

alleged deficiencies at Kilby: understaffing and lack of training.  It further appears from her complaint that she attempts to show that the officials personally had notice of these deficiencies by alleging they had an "improper custom or policy" rather than by alleging a "history of widespread abuse." *Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1266 (quoting *Hartley*, 193 F.3d at 1269) (internal quotation marks omitted).

The allegations in the administrator's complaint are insufficient to show that, in 2016, before Shook died, the three ADOC officials had an actual policy or custom of understaffing and inadequate training that included the deprivation of emergency medical care to inmates. While she makes 'conclusory allegations' that they did have such a policy, she has not alleged the basis for a finding that the policy even existed--that is, she has not identified in her allegations what documents, events, or circumstances reflect that the policy existed.  Nor are her conclusory allegations adequate to establish the

existence of a custom--that is, she has not alleged a pattern of events or long-standing circumstances that would support the conclusion that such a custom existed. Unsupported conclusory allegations of the existence of a policy or custom are insufficient to defeat a qualified-immunity defense. *See Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (finding the plaintiff's conclusory allegations of improper policies insufficient as she did not "describe any of the policies that were in place, the sort of policies that should have been in place, or how those policies could have prevented [the constitutional violation]"); *School Bd. Of Broward Cnty, Fla.*, 604 F.3d at 1267 (finding "insufficient" the plaintiff's "conclusory assertion of a custom or policy resulting in deliberate indifference to [her] constitutional right to be free from sexual assault").[2]

---

2. It may be that, in fact, in 2016, the three ADOC officials had deprived emergency medical care to inmates because of a policy or custom of understaffing and inadequate training, and discovery might very well reveal such. However, before government officials can be made

Therefore, the administrator's conclusory allegations of a policy or custom of understaffing and failure to train are inadequate.

To be sure, the administrator alleges the three ADOC officials were aware that Kilby was understaffed as early as 2012 and were informed by "auditors" in April 2014 that understaffing posed a "critical threat" to "Kilby's security." Second Am. Compl. (doc. no. 36) at 6. But this allegation regarding the impact of understaffing on *security* in 2014 is not enough to reflect a policy or custom of understaffing and the impact of the policy or custom on *medical care* in 2016--and, in particular, an

---

to confront litigation that might result in their being held personally liable in damages (as opposed to confronting litigation that might result in only injunctive relief), the complaint must give some basis for the conclusion that the policy or custom exists; as stated, a conclusory allegation of existence, by itself, is not enough. *See Franklin*, 738 F.3d at 1252 (forcing defendants to defend themselves based on "inadequate allegations ... undermines qualified immunity's fundamental purpose of protecting 'all but the plainly incompetent or those who knowingly violate the law' from the costs of suit") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted)).

understaffing policy or custom that the three ADOC officials had adopted and, in 2016, reasonably knew, or should have known, would result in the deprivation of emergency medical care to inmates.[3]

The administrator also alleges in her complaint that the ADOC officials had knowledge of a report from the "Medical Advisory Committee for Kilby." Second Am. Compl. (doc. no. 36) at 6-7. According to the complaint, this report simply stated that "correctional officers were not swiftly bringing inmates in for needed medical treatment, and that communication issues existed between correctional officer staff and medical staff ('Medical needs to integrate better w[ith] ADOC.')." Second Am.

---

3. As stated, it appears that the administrator attempts to show that the officials had notice by showing they had an "improper custom or policy" rather than by showing a "history of widespread abuse." *Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d at 1266 (quoting *Hartley*, 193 F.3d at 1269 (internal quotation marks omitted). However, even if the administrator had relied on a "history of widespread abuse," the underlying allegations are, again, merely conclusory and thus inadequate. The administrator does not allege events and circumstances that would support a finding of such history.

Compl. (doc. no. 36) at 6-7.  First, it is not made clear that this report was issued prior to Shook's death. Second, absent are non-conclusory allegations that would support a finding that the deficiencies in the report went unremedied and thus could be plausibly viewed as having been adopted as a policy or custom.

The administrator further alleges in her complaint that a disproportionate number of deaths occurred at Kilby in the same year that Shook died.  However, she alleges nothing to indicate that these deaths were the result of deprivations of medical care due to insufficient staffing or faulty training.

Because the plaintiff administrator has not sufficiently alleged, in a non-conclusory manner, that the ADOC officials were on notice of the alleged constitutional violation--a critical element of her claim--she cannot overcome qualified immunity on this theory either.  Thus, her federal claim against all three ADOC officials is due to be dismissed.

## B. State Claim

As stated, the plaintiff administrator sues the three ADOC officials, in their official and individual capacities, for wrongful death under Alabama law.

Alabama law prohibits damage-seeking claims against state officials in their official capacities. The law provides that: "A complaint seeking money damages against a State employee in his or her official capacity is considered a complaint against the State, and such a complaint is barred by Art. I, § 14, Alabama Constitution of 1901." *Ex parte Butts*, 775 So.2d 173, 177 (Ala. 2000) (internal citation omitted). The official-capacity state claim is likewise barred by the Eleventh Amendment of the United States Constitution. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-102 (1984) ("as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State

is barred regardless of whether it seeks damages or injunctive relief"). The court will therefore dismiss the state claim against the ADOC defendants in their official capacities.

The ADOC officials argue they are also immune from this state claim in their individual capacities under Alabama's state-agent immunity doctrine. In *Ex parte Butts,* 775 So.2d at 177–78, the Alabama Supreme Court adopted a restatement of state-agent immunity, as follows, in part:

> "A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> > (a) making administrative adjudications;
> >
> > (b) allocating resources;
> >
> > (c) negotiating contracts;

> (d)     hiring,     firing,     transferring,
> assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department
> or agency by statute, rule, or regulation,
> insofar as the statute, rule, or regulation
> prescribes the manner for performing the duties
> and the State agent performs the duties in that
> manner . . . ."

*Id.* at 177-78 (quoting a rule first articulated by the plurality in *Ex parte Cranman,* 792 So.2d 392, 405 (Ala. 2000)) (emphasis in original).  The court also recognized certain exceptions to, or limitations on, this immunity:

> "[However,] a State agent *shall not* be immune
> from civil liability in his or her personal
> capacity
>
> (1)   when the Constitution or laws of the United
> States, or the Constitution of this State,
> or laws, rules, or regulations of this State
> enacted or promulgated for the purpose of
> regulating the activities of a governmental
> agency require otherwise; or
>
> (2)   when the State agent acts willfully,
> maliciously, fraudulently, in bad faith, beyond
> his or her authority, or under a mistaken
> interpretation of the law."

*Id.* at 178 (quoting *Cranman*, 792 So.2d at 405 (plurality opinion)) (emphasis in original).

Under the burden-shifting framework established by the Alabama Supreme Court, the defendant officials bear the initial burden of establishing that they were acting in a function that would entitle them to state-agent immunity.  *See Ex parte Estate of Reynolds,* 946 So.2d 450, 452 (Ala. 2006).  If the defendants make "such a showing, the burden then shifts to the plaintiff to show that [the defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority." *Id.* (citations omitted).

The court finds that the ADOC officials are clearly entitled to raise the defense of state-agent immunity because the alleged conduct regarding staffing and training correctional officers falls directly into the categories of "formulating plans, policies, or designs" and "exercising ... judgment in the administration of a department ..., including, but not limited to ... hiring, firing, transferring, assigning, or supervising personnel." *Cranman*, 792 So.2d at 405.  In fact, the

Alabama Supreme Court has held specifically that "employees of the [A]DOC are entitled to State-agent immunity when in conducting the activities made the basis of the action they were exercising 'judgment in the administration' of the [A]DOC." *Carpenter v. Tillman*, 948 So.2d 536, 538 (Ala. 2006) (quoting *Cranman*, 792 So.2d at 405).

Thus, the burden shifts to the administrator to establish that the nature of the three ADOC officials' conduct exempts them from state-agent immunity. To satisfy her burden, the administrator contends that the three ADOC officials acted "willfully and in bad faith." Plaintiff's Response (doc. no. 50) at 10. To support this contention, she points to the parts of her complaint where she alleges that the three ADOC officials had a policy or custom of understaffing and inadequate training that included the deprivation of emergency medical care to inmates. As demonstrated above, these allegations constitute nothing more than unsupported conclusions, and

these conclusory allegations are, as with the qualified-immunity defense, insufficient to defeat state-agent immunity. *See Ex parte Gilland*, 274 So.3d 976, 985 n.3 (Ala. 2018) ("Although we are required to accept [plaintiff]'s *factual* allegations as true at this stage of the proceedings, we are not required to accept her *conclusory* allegations that [defendant] acted willfully, maliciously, fraudulently, or in bad faith. Rather, to survive [defendant]'s motion to dismiss, [plaintiff] was required to plead *facts* that would support those conclusory allegations.") (emphasis in original).

Because, in support of her contention of willfulness and bad faith on the part of the three ADOC officials, the administrator has failed to allege the basis for a finding that the policy of understaffing and inadequate training existed--that is, she has not identified in her allegations what documents, events, or circumstances reflect that the policy existed--and because she has

failed to allege the basis for a finding that the custom of understaffing and inadequate training existed--that is, she has not alleged a pattern of events or long-standing circumstances that would support the conclusion that such a custom existed--the ADOC officials are entitled to state-agent immunity from the state wrongful death claim.[4]

---

4. In her complaint, the plaintiff administrator further alleges that the three ADOC officials are liable because they "engag[ed] in ... policies, practices, and customs," Second Am. Compl. (doc. no. 36) at 12, of failing "to hire, train, and place sufficient numbers of officers in Kilby Correctional Facility to properly monitor inmates" and "to control the dissemination of contraband, including illicit drugs, among inmates." *Id.* It is unclear whether, with these allegations, the administrator is seeking to hold the three ADOC officials liable, in both her federal and state claims, for the actions of correctional officer Giles. But, if so, the allegations, which are similar to the ones discussed earlier, are too conclusory to defeat the officials' qualified-immunity defense to the federal claim and their state-agent immunity defense to the state claim. Again, the administrator has failed to allege the basis for a finding that the policy of understaffing and inadequate training, that includes inadequate monitoring of inmates and inadequate control of the dissemination of contraband, existed--that is, she has not identified in her allegations what documents, events, or circumstances reflect that the policy existed--and has failed to allege

**\*\*\***

The flow of drugs inside an institution that is intended to punish and rehabilitate is deeply concerning and led to a tragic result in this case. Nonetheless, the plaintiff administrator has not overcome the defenses of qualified immunity and state-agent immunity in her claims against the ADOC officials. Accordingly, Dunn, Naglich, and Billups's motion to dismiss will be granted, and they will be dismissed and terminated as parties.

An appropriate judgment will be entered.

DONE, this the 25th day of March, 2020.

      /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE

---

the basis for a finding that the custom of understaffing and inadequate training, that includes inadequate monitoring of inmates and inadequate control of the dissemination of contraband, existed--that is, she has not alleged a pattern of events or long-standing circumstances that would support the conclusion that such a custom existed.